# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | <u>TO BE FILED UNDER SEAL</u> |
| | : | |
| v. | : | Hon. André M. Espinosa |
| | : | |
| JOHN DESALVO | : | Mag. No. 23-11153 |
| | : | |
| | : | CRIMINAL COMPLAINT |

I, Alexandra Cullen, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

### SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this Complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

*Alexandra Cullen*

Alexandra Cullen, Special Agent
Federal Bureau of Investigation

Special Agent Cullen attested to this Complaint by telephone pursuant to FRCP 4.1(b)(2)(A).

August 22, 2023 at
Newark, New Jersey

HONORABLE ANDRÉ M. ESPINOSA
UNITED STATES MAGISTRATE JUDGE          Signature of Judicial Officer

Signed by Special Agent Cullen at Judge Espinosa's direction pursuant to F.R.C.P. 4.1(b)(6)(C).

## ATTACHMENT A

### COUNT ONE
### (Wire Fraud)

Between in or around November 2021 and in or around May 2022, in the District of New Jersey and elsewhere, the defendant,

### JOHN DESALVO,

Did knowingly and intentionally devise and intend to devise a scheme and artifice to defraud victim investors and to obtain money and property from victim investors by means of materially false and fraudulent pretenses, representations, and promises, and, for purposes of executing and attempting to execute such scheme and artifice to defraud, did knowingly and intentionally transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce certain writings, signs, signals, pictures, and sounds, to wit, an interstate wire transfer of approximately $20,000 made by Victim-2 on or about May 11, 2022 that traveled through New Jersey.

In violation of Title 18, United States Code, Section 1343.

## COUNT TWO
**(Securities Fraud)**

Between in or around November 2021 and in or around May 2022, in the District of New Jersey and elsewhere, the defendant,

JOHN DESALVO,

by use of the means and instrumentalities of interstate commerce, the mails, and facilities of national securities exchanges, directly and indirectly, did knowingly and willfully use manipulative and deceptive devices and contrivances in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon investors and potential investors in connection with the purchase and sale of the cryptocurrency token "Blazar".

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

## COUNT THREE
### (Money Laundering)

Between in or around November 2021 and in or around May 2022, in the District of New Jersey and elsewhere, the defendant,

JOHN DESALVO,

did knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, wire fraud and securities fraud, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity.

In violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

4

### COUNT FOUR
**(Wire Fraud)**

Between in or around January 2021 and in or around May 2021, in the District of New Jersey and elsewhere, the defendant,

JOHN DESALVO,

did knowingly and intentionally devise and intend to devise a scheme and artifice to defraud victim investors and to obtain money and property from victim investors by means of materially false and fraudulent pretenses, representations, and promises, and, for purposes of executing and attempting to execute such scheme and artifice to defraud, did knowingly and intentionally transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce certain writings, signs, signals, pictures, and sounds, to wit, an interstate wire transfer of approximately $5,000 made by Victim-4 on or about February 3, 2021 that traveled through New Jersey.

In violation of Title 18, United States Code, Section 1343.

## COUNT FIVE
### (Securities Fraud)

Between in or around January 2021 and in or around May 2021, in the District of New Jersey and elsewhere, the defendant,

JOHN DESALVO,

by use of the means and instrumentalities of interstate commerce, the mails, and facilities of national securities exchanges, directly and indirectly, did knowingly and willfully use manipulative and deceptive devices and contrivances in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon investors and potential investors in connection with the purchase and sale of securities through an investment account controlled by DESALVO at Brokerage-1.

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

6

## COUNT SIX
### (Money Laundering)

Between in or around January 2021 and in or around May 2021, in the District of New Jersey and elsewhere, the defendant,

JOHN DESALVO,

did knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, wire fraud and securities fraud, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity.

In violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

7

## ATTACHMENT B

I, Alexandra Cullen, am a Special Agent with the Federal Bureau of Investigation. I graduated from the FBI Academy in Quantico, Virginia on June 2022. I am familiar with the facts set forth herein based on my own investigation, my conversations with other law enforcement officers, and my review of reports, documents, and other evidence. Because this Complaint is being submitted for a limited purpose, I have not set forth each and every fact that I know concerning this investigation. Where statements of others are related herein, they are related in substance and in part unless otherwise indicated. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

## I.   Background

### A.   Relevant Regulatory Principles and Definitions

1.    The United States Securities and Exchange Commission ("SEC") was an independent agency of the executive branch of the United States government. The SEC was responsible for protecting investors, enforcing federal securities laws, and promulgating rules and regulations in keeping with the same.

2.    A "digital asset" or "digital token" generally referred to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets referred to as "cryptocurrencies," "virtual currencies," and "digital coins."

3.    The "blockchain" was a distributed public ledger that recorded incoming and outgoing cryptocurrency transactions.

4.    A cryptocurrency white paper generally provided investors and prospective investors with an explanation of a particular cryptocurrency investment offering, including the purpose and technology behind the offering, how the offering was different from other cryptocurrency opportunities, and the prospects for the offering's profitability.

5.    Under Title 15, United States Code, Section 77b(a)(1), a "security" included a wide range of investment vehicles, including "investment contracts." Investment contracts were instruments, schemes, or transactions through which a person invested money in a common enterprise and reasonably expected profits or returns derived from the entrepreneurial or managerial efforts of others. Federal law required that an issuer of securities register offers and sales of those securities with the SEC when they offered and sold securities to the public, absent certain specified exemptions.

6.    An initial coin offering ("ICO") was a capital raising event in which an entity offered investors a unique "coin" or "token" in exchange for consideration—most commonly in the form of established virtual currencies or fiat currency. These tokens were issued on a blockchain and were oftentimes listed on online platforms, called

8

virtual currency exchanges, where they were tradable for virtual or fiat currencies. To participate in an ICO, investors were typically required to transfer virtual currencies to the issuer's address, online wallet, or other account. During an ICO, or after its completion, the issuer would typically distribute its unique "tokens" to the participants' unique address on the related virtual currency's blockchain. Like stockholders in an initial public offering ("IPO"), holders of these tokens were then entitled to certain rights related to a venture underlying the ICO, such as profits, shares of assets, use of certain services provided by the issuer, and voting rights.

7.   ICOs and cryptocurrency investment opportunities that qualified as "securities" were required to be registered with the SEC.

**B.   The Defendant and Relevant Entities**

8.   The defendant, JOHN DESALVO ("DESALVO"), was a former New Jersey State Correctional Police Officer and a resident of Marmora, New Jersey.

9.   DESALVO was (a) the founder and promoter of a digital token known as Blazar Token ("Blazar"); and (b) the manager of an investment group operated through Brokerage-1, an online trading platform (the "Investment Group").

10.   DESALVO maintained a personal bank account at Bank-1 ("the DESALVO Bank-1 Account").

11.   Individual-1, a resident of Williamstown, New Jersey, was a former police officer in New Jersey and was an investor in, and promoter of, Blazar.

12.   Victim-1 was a resident of Nashua, New Hampshire and an investor in Blazar.

13.   Victim-2 was a resident of Atlanta, Georgia and an investor in Blazar.

14.   Victim-3 was a resident of New Jersey and an investor in Blazar.

15.   Victim-4 was a resident of New Jersey and an investor in the Investment Group.

## II.  The Blazar Token Fraud

### A.   Overview

16.   In or around November 2021, DESALVO developed Blazar and promoted it primarily to law enforcement, fire personnel, EMTs, and other first responders as an alternative to state pension systems.  The Blazar whitepaper (the "Whitepaper") identified DESALVO as Blazar's founder and formally announced the Blazar ICO.

17.    The Whitepaper, which described Blazar as "the crypto pension," decried government-run pension systems and offered Blazar investors the ability to "transition out of the current pension system and into one of the future." The Whitepaper also claimed that Blazar would be "the first token or coin that [would be] able to be purchased through payroll deduction every week" and would be "taken out of [an investor's] weekly earnings PRETAX similar to payment into a pension, 401k, IRA, or any other retirement savings plan." The Whitepaper boasted that an investment in Blazar would offer investors "more stability than any other token" and that the value of the Blazar token would "continue to rise over time similar to any investment fund, only at a much higher rate of success."

18.    As set forth herein, despite claims to the contrary, DESALVO never registered the ICO associated with the Blazar offering with the SEC, nor did DESALVO have a valid exemption from the SEC's registration requirements.

19.    In connection with the solicitation of investment in Blazar, DESALVO provided several potential investors with a contract that described how Blazar's management team would use investor funds. Specifically, the contract stated that "proceeds from token sales during the ICO will be used for the development of the token, gas fees, advertising, marketing, exchange listing fees, and liquidity." The contract further guaranteed that "there will be absolutely no use of Blazar Token's funds for the self-interest in any Member of Blazar Token's management team." Only a few investors executed the contract prior to investing in Blazar. Further, as part of their investment in Blazar, investors were prohibited from selling their Blazar tokens in the 90-day window post-ICO. Similarly, DESALVO was prohibited from selling any of his "founders tokens" for a six-month period post-ICO.

20.    Following the launch of Blazar, DESALVO recruited others, including Individual-1, to help him solicit investment in the token. Specifically, in or around January 2022, Individual-1 invested $25,000 in Blazar and, in exchange, agreed to assist DESALVO in its promotion. Individual-1 thereafter solicited investment in Blazar and oversaw the development of computer code associated with Blazar's smart contract. During this time, DESALVO retained full control over Blazar's operation, including all bank accounts, exchange accounts, and payment processor accounts used by DESALVO to accept Blazar investor funds.

21.    In total, between in or around November 2021 and in or around May 2022, DESALVO, Individual-1, and others acting at DESALVO'S direction, raised approximately $620,000 from approximately 225 investors in Blazar, including Victims-1, -2, and -3.

### B.    Misrepresentations

22.    DESALVO promoted Blazar through a variety of means including social media platforms (e.g., Facebook, Twitter, Telegram, and Reddit), direct phone calls, and online press releases. Through his promotion of Blazar, DESALVO, in addition to

other material misrepresentations, falsely claimed that (1) Blazar was in the process of becoming, or was already, a securitized token approved by the SEC; and (2) Blazar tokens could be purchased through payroll deductions and/or automated clearing house ("ACH") transactions.

23.    For example, on or about December 8, 2021, DESALVO posted the following to Instagram: "BLAZAR SET TO BECOME FIRST CRYPTO TOKEN EVER TO BE CLASSIFIED AS A SECURITY BY THE SEC." Approximately two weeks later, on or about December 26, 2021, DESALVO posted to Instagram, in relevant part: "We have also applied for and reached a pre approval of securitizing the token with the SEC. We have started the process of getting payroll deduction and ACH approved and are working with the leaders in that industry . . . to execute the trade." Approximately one week later, on or about January 3, 2022, DESALVO posted the following to Stocktwits regarding Blazar: "I have acquired a couple crypto firsts and have Payroll Deduction and ACH as a means to purchase it and have signed up around 12,000 accounts already for ACH. To get on Payroll we became a securitized token with the SEC."

24.    Further, in or around December 2021, DESALVO posted on Reddit stating, "Not only are we already designated a securitized token by te (sic) SEC, (we applied for this) but we are also serving a legitimate utility on a grand level. . . . We have ACH, and Payroll deduction already set up . . . with SOGOTRADE handling the trade itself[.]"

25.    Notwithstanding DESALVO'S statements, the investigation revealed that Blazar was never registered as a securitized token with the SEC. In fact, DESALVO never so much as applied to have Blazar registered with the SEC. Similarly, Blazar was never approved, as DESALVO claimed, for ACH payroll deduction in any state, and no such deductions were ever made from any investor's paycheck. In fact, the investigation revealed that on or about December 12, 2021, DESALVO sent an email to the trading platform Sogotrade, requesting that Sogotrade act as a "middleman" for Blazar transactions processed through ACH:

> Hello, My name is John DeSalvo and I am the founder and CEO of BLAZAR Token, a cryptocurrency token created to supplement and eventually replace the dated And failing governmental pension system. With that Said I have secured hundreds of thousands of Police Officers and Firefighters support in them investing in our token through payroll deduction and ACH withdrawal. We are set to go live on UNISWAP exchange in mid to late January and before that occurs I need to solve this issue. We would like you to be the middle man, so to speak, On this transaction. Our customers would have their money deducted from their check or bank account and Sent to your clearing house . Once funds are cleared we would then need you to coordinate the purchase of BLAZAR Token from the

UNISWAP exchange. Please reach out to me ASAP if This is of interest to you. I have already secured being listed as a security via the SEC and have around 564,000 Police and Fire members waiting…

26.    However, despite DESALVO'S claims to investors that payroll deductions were already "set up" through Sogotrade, Sogotrade ultimately denied DESALVO'S request. Specifically, according to Sogotrade records, on or about January 5, 2022, DESALVO initiated a chat with Sogotrade and inquired about the above request. A Sogotrade representative responded, "Sorry. We do not support new token[.]"

27.    In addition to the above misrepresentations, DESALVO frequently promised inflated rates of return to potential Blazar investors both through social media posts and individual investment pitches. For example:

   a.    On or about January 9, 2022, DESALVO posted the following to Facebook: "What if I told you BLAZAR Token can get you 22.1% GUARANTEED and it's not a lie? Well we can, and it's all done by the Staking Reward Returns we will receive by investing in a multitude of projects. 22% GUARANTEED with ZERO Risk. Tune in Tuesday to find out how. . .We are talking GUARANTEED Returns with 37 months of Backed up contractual Proof since it's inception."

   b.    On or about April 11, 2022, DESALVO published an online article, which stated "What if I told you that through the Staking of our Token, BLAZAR, we could Guarantee you contractually over 30-40% return rates on your money? Well, we can…"

   c.    On or about April 13, 2022, DESALVO published an online article, which stated "Once people see the guaranteed rates of return we are able to offer our investors it's only a matter of time before the existing pension systems in place are completely discarded. The bottom line is they can't come close to the contractually guaranteed rates of return we offer through staking. Staking rates have been known to exceed 30-40% in some cases, which would be impossible to ascertain in the traditional sense."

28.    In reality, and as discussed below, Blazar never provided investors with a return on their investment as promised by DESALVO. In fact, most, if not all, of Blazar investors ultimately lost their entire investment.

29.    Additionally, in an effort to further legitimize Blazar, DESALVO falsely claimed to investors that the token was being offered for purchase through various well-known cryptocurrency exchanges such as Coinbase, Bitmart, and Binance. For example:

a. On or about May 10, 2022, in a text message conversation with a potential Blazar investor, DESALVO stated, "We also Just received confirmation that BITMART Exchange accepted us. They are Top 5 in the world and would be a great prerequisite for GEMINI. It's a $50,000 listing fee, but I'm going to make It Happen." On the same date, DESALVO sent a text message to a different potential Blazar investor which stated, "I got on BitMart! And Gemini!"

b. On or about June 17, 2022, in a text message conversation with a potential Blazar investor, DESALVO stated, "BLAZAR was just approved to be listed on BINANCE!!!"

30. Notwithstanding DESALVO'S statements, the investigation revealed that Blazar was never offered for sale through Coinbase, Bitmart, or Binance.

31. Interviews with Blazar investors revealed that individual investors relied on the above representations made by DESALVO in deciding to invest in Blazar.

## C.   Acceptance/Misuse of Investor Funds

32. Throughout the scheme, DESALVO accepted Blazar investor funds through a variety of means, including, but not limited to: (1) wire transfers to the DESALVO Bank-1 Account; (2) transfers of cryptocurrency to wallets maintained by DESALVO at various cryptocurrency exchanges; and (3) transfers to accounts maintained by DESALVO at various payment processors such as PayPal, Venmo, and CashApp.

33. After receiving Blazar investor funds, DESALVO at times used the funds for certain Blazar related transactions such as advertising and the purchase of tokens on behalf of investors. More often, however, DESALVO used investor funds for various illicit purposes, including, but not limited to: (1) personal expenses; (2) unauthorized day trading in volatile cryptocurrencies; and (3) payments made to prior investors in the manner of a Ponzi scheme.

34. By way of example, on or about May 2, 2022, Victim-1 transferred approximately 1.06 Bitcoin valued at approximately $41,000 to a Coinbase account held by DESALVO (the "DESALVO Coinbase Account") for the purpose of investing in Blazar. According to Coinbase records, after Victim-1's funds were received into the DESALVO Coinbase Account, DESALVO used Victim-1's Bitcoin to purchase approximately $40,700 worth of a cryptocurrency called Kyber Network Crystal ("KNC"). Over the following approximately ten days, DESALVO then engaged in a series of hundreds of transactions involving the purchased KNC in which DESALVO rapidly converted the funds back and forth from KNC to a different cryptocurrency, Tether ("USDT"). At the conclusion of these transactions, DESALVO diminished the value of Victim-1's funds by more than $21,000. This style of rapidly trading in various cryptocurrencies is representative of how DESALVO often used investor funds after receiving them.

35.   By way of further example, on or about May 11, 2022, Victim-2 wired $20,000 to the DESALVO Bank-1 Account for the purpose of investing in Blazar (the "Victim-2 Wire Transfer"). Based on this investigation, the Victim-2 Wire Transfer traveled through New Jersey.  At the time of the Victim-2 Wire Transfer, the DESALVO Bank-1 Account had a balance of $9,599.26.  Approximately two days later, on or about May 13, 2022, DESALVO transferred approximately $18,333 in two separate transactions from the DESALVO Bank-1 Account to the DESALVO Coinbase Account.  On the same date, once the funds were received into the DESALVO Coinbase Account, DESALVO used the funds to purchase approximately $17,988.92 in KNC. After receiving the KNC funds, DESALVO proceeded to engage in a series of rapid trades involving the KNC.

36.   On or about May 19, 2022, another Blazar investor ("Victim-3") contacted DESALVO via text message and told DESALVO that he learned that Blazar was a scam and that he had hired a law firm to recoup his investment funds. DESALVO responded by stating, "just send me address where to send it." Victim-3 provided DESALVO with a cryptocurrency wallet address ending in 9Cd8 (the "Victim-3 Wallet") and demanded that DESALVO return $21,200, which represented Victim-3's investment as well as investments made by five other Blazar investors. Minutes later, DESALVO responded, "21,350 coming . . . from Coinbase." According to Coinbase records, at or around the time of DESALVO'S conversation with Victim-3, DESALVO liquidated approximately $30,433 in KNC, which represented funds received from Victims-1 and -2. DESALVO then transferred approximately $21,324.91 to the Victim-3 Wallet as requested by Victim-3.

37.  Further analysis of victim funds revealed that DESALVO frequently converted victim funds to the cryptocurrency Ethereum 2.0 ("ETH2") and then liquidated the ETH2 for his own personal use. Specifically, tracing of victim investments revealed that DESALVO converted at least $47,000 of investor funds to ETH2, which DESALVO then transferred from the DESALVO Coinbase Account to the DESALVO Bank-1 Account. DESALVO then used the funds for ATM withdrawals, deposits to brokerage accounts controlled by DESALVO, and transfers to DESALVO'S relatives.

## D.  The Blazar Liquidation Event

38.  As explained above, pursuant to their investment agreements, Blazar investors were prohibited from selling their Blazar tokens in the 90-day window post-ICO. Similarly, DESALVO was prohibited from selling any of his "founders tokens" for a six-month period post-ICO. The Blazar ICO concluded on April 21, 2022. However, between May 11, 2022 and May 22, 2022, DESALVO sold more than 41 billion Blazar tokens, including his "founder's tokens" (almost all the tokens he controlled), for an approximate value of $51,000. DESALVO'S sale had a seismic impact on the value of Blazar. Specifically, a Blazar investment worth $1,000 prior to DESALVO'S liquidation was worth $1.15 after the event. Based on this investigation, the funds from DESALVO'S sales were transferred to one of several personally held

cryptocurrency wallets. Following the event, the value of Blazar continued to decline and never recovered. As of the date of this writing, most Blazar investors are still holding their Blazar tokens, which are now largely worthless.

## III.  **The Investment Group Fraud**

39.   Prior to launching Blazar, and beginning in or around January 2021, DESALVO managed and solicited investment in the Investment Group. Specifically, based on this investigation, on or about January 19, 2021, DESALVO registered an account with Brokerage-1 under the name "Investment Club Account." In the application with Brokerage-1, DESALVO claimed the account was going to be for "long term investment with occasional transfers."

40.   Similar to how DESALVO marketed investment in Blazar, DESALVO solicited investment in the Investment Group through social media, including his personal Facebook account. For example, on or about January 27, 2021, DESALVO sent a potential investor a message on Facebook, which stated, "I added twenty spots to the stock mart investment group @ $5,000 per spot.  If you want to get [one] or multiple spots let me know ASAP and we will set up payment." Later, on or about February 2, 2021, DESALVO made the following posts to his personal Facebook page:

> Ok so we had a meeting this morning and yes we will be doing the 5k account. Comment below if you want more information and I'll get back to you with the group texts.
>
> If you want in with the 5k investment group I need you to wire the money to the E*TRADE account. This way you have a legal record of the transaction and a receipt. I'm starting the group ASAP. You need to get a hold of me.
>
> Anyone getting in the Invest Group you need to get the wire form from me and wire $5,000 into the group's account 4942-7857. That's our brokerage account. You would use the form below and wire $5,000 into the account. I'm only taking the first 20 people. That's all! As of now I have been 10-15 locked in. Text me . . . if you need a spot saved. They will be gone by the morning.
>
> "*** UPDATE 2 Spots Left*** (3) Three spots left if our INVEST group. This is the one and ONLY invest group we are doing. It is $5,000 ONE TIME ONLY. You sit back and relax and get rich!"

41.   On or about February 3, 2021, DESALVO sent a message to Victim-4 on Facebook, which stated, "I've done this three times since the summer. I'm not guaranteeing we get the same results, but so far the other 3 accounts are all over 1/2

million and they started with over $25,000. . . . I've had days where I've made over $300,000 in one day!" On this same date, Victim-4 wired $5,000 to a checking account maintained by DESALVO at Brokerage-1 for the purpose of investing in the Investment Group (the "Victim-4 Wire Transfer"). The Victim-4 Wire Transfer traveled through New Jersey.

42. On or about February 4, 2021, to solicit investor participation in his E*Trade investment group, DeSalvo posted the following on his personal Facebook account:

> • "*** Stock Investment Group *** Our E*Trade investment group is still waiting on a few people to pay so we have a couple spots open since money talks. $5,000 to join in. You need to wire it to E*Trade ASAP. Text me if interested."

> • "E*Trade investment group MONEY is DUE TOMORROW!!! After tomorrow NO EXCEPTIONS and there won't be another group. This is it!!! I have spots available due to lack of payment. So far 12 people have paid in full. Next 8 people to pay $5,000 get the spot. Text me or DM me. This is it!!!"

43. In total, between February 3, 2021 and February 8, 2021, a total of seventeen investors sent DESALVO a total of approximately $95,000 for investment in the Investment Group. At the time of the first investment, the Investment Group account at Brokerage-1 had a balance of $310. Following all victim investments, the account had a net total of $96,303, reflecting that DESALVO contributed only $1,303 of his own funds to the Investment Group account.

44. During this time, DESALVO sent a series of emails to Investment Group investors regarding the types of trading activity DESALVO was purportedly engaging in. For example, on or about February 5, 2021, in an email to Investment Group investors, DESALVO stated, "[] come Monday morning [] I am going to start buying some options and get this thing going. [] As for investments I will try to email you a list of our holdings and our total balance each and every morning."

45. Similarly, on or about February 6, 2021, in an email to Investment Group investors, DESALVO stated, "DO NOT CALL me between the hours of 9:00 AM to 5:00 PM Mon – Fri under any circumstance. I am usually trading options and do this with my cell. [] Each day I will provide a balance update along with what stocks / crypto we are holding."

46. DESALVO also touted his own supposed investment success to the Investment Group. For example, on or about February 7, 2021, in an email to Investment Group investors, DESALVO stated, "I have been averaging close to 1200% over the last 2 years. I am in the top 1,000[th] percent in the world. That's the truth, the

return rates I have been averaging are so high that I have people throwing money at me to invest." A review of DESALVO'S personal trading records during the relevant time period revealed that DESALVO never earned returns close to what he promoted to investors.

47.    Further, a review of Brokerage-1 records revealed that DESALVO engaged in only small amounts of trading on behalf of the Investment Group before transferring the Investment Group's funds out of Brokerage-1 and into the DESALVO Coinbase Account and other accounts controlled by DESALVO.

48.    Specifically, according to Brokerage-1 records, on or about February 9, 2021, the Investment Group Account had a balance of approximately $141,414, representing gains of approximately $46,000 - its highest valuation.

49.    Between on or about February 11, 2021 and on or about February 24, 2021, however, DESALVO began to transfer funds out of the Investment Group Account. Specifically, during that timeframe, DESALVO transferred approximately $83,612 from the Investment Group Account to a personal account held by DESALVO at Brokerage-1 (the "DESALVO Brokerage-1 Account"). Approximately $56,527 of those funds were then transferred by DESALVO from the DESALVO Brokerage-1 Account to the DESALVO Coinbase Account where he commingled investor funds with his own personal investments and used those funds to purchase various cryptocurrencies.

50.    On or about February 11, 2021, DESALVO transferred approximately $4,656 from the Investment Club Account to the DESALVO Brokerage-1 Account. These funds were combined with $4,247 transferred in from another DESALVO Brokerage-1 account and were primarily used to pay credit card bills.

51.    On or about February 19, 2021, DESALVO transferred approximately $18,972 from the Investment Club Account to the DESALVO Brokerage-1 Account in two separate transactions. DESALVO then transferred the funds to the DESALVO Coinbase Account where he purchased approximately 581 tokens of the cryptocurrency Chainlink ("LINK").

52.    On or about February 22, 2021, DESALVO transferred $21,755 from the Investment Club Account to the DESALVO Brokerage-1 Account. DESALVO then transferred approximately $15,527 to the DESALVO Coinbase Account where he purchased approximately 412 LINK and 0.02 Bitcoin. The remainder of the funds were transferred to another Brokerage-1 account held in the name of DESALVO'S daughter.

53.    Finally, on or about February 24, 2021, DESALVO transferred approximately $37,390 from the Investment Club Account to the DESALVO Brokerage-1 Account. Approximately $10,000 of those funds were then used to pay a contractor who performed renovations on DESALVO'S personal residence. An additional $22,000 was transferred to the DESALVO Coinbase Account where

DeSalvo then purchased 311 LINK and 0.20 Bitcoin. Following these transactions, the Investment Group Account had a balance of $0.

54.    On the same date, DESALVO sent a message to an Investment Group investor, which stated, "We're done. Biggest crash of the Nasdaq in 27 years. 11 of 13 days down in a row."

55.    Later, between on or about March 11, 2021 and on or about March 12, 2021, DESALVO transferred approximately $65,000 from the DESALVO Coinbase Account to the DESALVO Brokerage-1 Account.

56.    The following day, on or about March 13, 2021, DESALVO exchanged a series of text messages with Victim-4, an Investment Group investor. In the messages, Victim-4 accused DESALVO of "ducking out" on the Investment Group.  DESALVO responded by stating:

> You haven't been getting the emails I sent out? I sent out around 20 emails. Nah man I'm not like that at all. I kept in touch with everyone daily via email. We went up to 171k after day 2 and then lost around 80k in aurora cannabis someone in the Group pled with me to buy. After that i bought all options in Fcel, BNGO, and PLUG. Needless to Say the nasdaq took a plunge down to nothing and the options were worthless. Literally the worst 2 week span I've ever seen in the nasdaq. Any other time and we would have crushed it but those 2 weeks were Impossible to overcome. I lost 400k in one day alone. I'm left stunned to say the least. But yea I have all the market reports daily I can send over I thought you were Getting the emails i sent out?

57.    After Victim-4 told DESALVO he had not received a "single email," DESALVO responded, in relevant part:

> I've stayed out of the market with what I have left, which is minimal To say the least. . . . Anyway, I can pull the docs off [Brokerage-1] on what we invested in, I'll have to call them Monday. To be honest (nothing to do with you whatsoever) but this is why I didn't want to start a group. I had a feeling the market would go to shit, as it did, and I'm left looking like an [a**] no matter what. During that two week span it didn't matter what we bought it was all getting crushed. Every single stock I follow went down 35-50-%. And when you have options that 35-50 is 95-100%. It's sucked.

58.    Meanwhile, between on or about March 13, 2021 and on or about March 15,

2021, DESALVO transferred approximately $64,459 from the DESALVO Brokerage-1 Account to the DESALVO Coinbase Account, representing all but $1,041 of the transfers made by DESALVO between March 11, 2021 and March 13, 2021, described above.

59.   Between on or about March 14, 2021 and May 20, 2021, DESALVO then transferred approximately $48,985 in various cryptocurrencies from the DESALVO Coinbase Account to various other wallets.

60.   During this time, DESALVO continued to claim to Investment Group investors that their money had been lost because of poor market conditions. For example, on or about May 17, 2021, DESALVO emailed Investment Group members the following:

> Well first and foremost I wanted to start off by apologizing to each of you because I was just notified that NO ONE has received any of the 77, yes SEVENTY SEVEN emails I have been sending out each and every day since we started this group. I have them all in my outbox but for some reason since I pressed forward instead of send to add all the addresses they simply all went to my outbox. Anyone who would like to receive any of them please email me and I'll send them.
>
> As you know I do NOT buy individual stocks EVER[1]. It's only options since they yield the largest returns but also inherit the most risk. We started off with $100,000 and after two days had around $177,000. The following day someone in this group requested a few times that I buy $25,000 worth of options in a well know pot stock (Aurora). Well that stock Immediately tanked and the 25k was gone in a matter of 3/4 days.
>
> . . . .
>
> [] Put it this way, I personally started February with 1.2 million in the tech sector. I ended February with $88,000. Yes I lost one million dollars of my OWN money in 16

---

[1]      Brokerage-1 records revealed that DESALVO purchased "individual stocks" in the Investment Club Account on at least seven occasions, including February 10, 2021 and February 11, 2021 purchases of 1,010 shares in Company-1 for a total purchase price of approximately $21,700. DESALVO never purchased Company-1 options. While the Company-1 stock did decline, it did not go to zero. On or about February 17, 2021, DeSalvo sold 1,010 Company-1 shares for approximately $13,500 and realized a loss of approximately $8,200, not $25,000.

days[2]. So as for the account it ended February with around $27,000. Since then the market has traded sideways and honestly there is nothing at all that I can say I would buy in the stock market...

...I don't have anything or any interest in this group's investment. I was asked to do this as a favor because I was doing so well. I didn't want to and posted on FB until I was begged to do it.  Reason why I didn't want to is it's a no win for me. Everyone expected to get rich so if we did it's only what I'm supposed to do.  If the market turns (as it did) and we lose money; I'm the A[**]hole.  So that's why I wanted no parts of this.

61.    Later, on or about May 17, 2021, in an email to Investment Group investors, DESALVO stated, "Well we were up to $161,000. That is until someone in this group texted me about 30 times to use our money to buy [Company-1 stock]. Needless to say we now have $104,000. So with that said here's the deal. Please don't text me and tell me what to buy. My account is up $91,000 today. I know what I'm doing. I don't need your advice. If you want certain stocks buy them on your own or withdraw your money." A review of Brokerage-1 records revealed that this statement was false as DESALVO had already drained the Investment Group Account by this date.

62.    On or about the same date, DESALVO emailed the Investment Group members, stating, "The stock market has continued its free fall. . . . I don't see an end anywhere in sight right now. [] With that said I think it's time to go to an all cash account and move into crypto []. Our balance is at $77k at the close. I'll keep you updated but I'm not expecting much as far as any gains until next week." Later on or about the same date, DESALVO emailed Investment Group members, stating, "we are getting smoked today."

63.    On or about May 18, 2021, DESALVO sent an email to Investment Group investors with a subject line that read "All Orders." The email stated, "here is every order we placed and how each option expired and what the balance was before and after each." DESALVO attached to the email small and blurry screenshots that purported to show various trading activity over a period of time, however the screenshots were too blurry to read.

64.    On or about the same date, DESALVO emailed the investment club participants with a subject line that read "Balance (Not Good)." The email stated, "all options are down again. They expire Friday and I don't see any way they are met. They are going to expire unfulfilled and when this happens the balance will be zero. Look

---

2       A review of Brokerage-1 records revealed this was false.  At the beginning of February, DESALVO controlled approximately $629,000 spread across eight Brokerage-1 accounts that he controlled. At the end of February, those accounts were valued at approximately $243,000, reflecting far fewer losses than what DESALVO told investors.

at the chart below and you can see each day and what the balance was on each. $188,000 on April 1st, and under $10,000 on May 1st[.]" A review of Brokerage-1 records confirmed that these statements were false. Further, DESALVO attached several screenshots to the emails purporting to show positions held by the Investment Group with Brokerage-1. Notwithstanding DESALVO'S statements, the investigation revealed that the screenshots pertained to a brokerage account held by one of DESALVO'S family members at a different brokerage.

65.    Based on this investigation, none of the Investment Group members received any money back from DESALVO as a return on their investments.